**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THESSALUS CAPITAL, Derivatively on Behalf of TG THERAPEUTICS, INC., | ) ) ) |
| | ) |
| Plaintiff, | ) ) |
| | ) |
| vs. | ) ) |
| | ) |
| MICHAEL S. WEISS, LAURENCE N. CHARNEY, WILLIAM J. KENNEDY, MARK, SCHOENEBAUM, YANN ECHELARD, KENNETH HOBERMAN, DANIEL HUME, | ) ) ) ) ) ) |
| | ) |
| Defendants, | ) ) |
| | ) |
| and, | ) ) |
| | ) |
| TG THERAPEUTICS, INC., | ) ) |
| | ) |
| Nominal Defendant. | ) ) ) ) |

Case No:

**VERIFIED SHAREHOLDER**
**DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff, by and through its undersigned counsel, derivatively on behalf of Nominal Defendant TG Therapeutics, Inc. ("TG" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon its personal knowledge as to itself and its own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by TG with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

**NATURE OF THE ACTION**

1.     This is a shareholder derivative action brought in the right, and for the benefit, of

TG against certain of its directors seeking to remedy the Director Defendants' (defined herein) breach of fiduciary duties, corporate waste, and violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 that occurred from June 4, 2018 to the present (the "Relevant Period"), and which has caused substantial harm to TG.

## JURISDICTION AND VENUE

2.      Pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) of the Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

3.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) TG maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to TG, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

5.      ***Plaintiff Thessalus Capital*** is, and was at relevant times, a shareholder of TG. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

6.      ***Nominal Defendant*** TG is a biopharmaceutical company engaged in the acquisition, development, and commercialization of treatments for cancer and autoimmune diseases in the United States.

**Director Defendants**

7.      ***Defendant Michael S. Weiss*** ("Weiss") has served as TG's Executive Chairman of the Board of Directors ("Board"), Chief Executive Officer and President since December 2011.

8.      ***Defendant Laurence N. Charney*** ("Charney") has served on the TG Board since April 2012 and is a member of its Audit Committee and Compensation Committee.

9.      ***Defendant William J. Kennedy*** ("Kennedy") has served on the TG Board since April 2012 and is a member of its Audit Committee and Compensation Committee.

10.      ***Defendant Mark Schoenebaum*** ("Schoenebaum") has served on the TG Board since April 2012 and is a member of its Compensation Committee.

11.      ***Defendant Yann Echelard*** ("Echelard") has served on the TG Board since November 2012 and is a member of its Compensation Committee.

12.      ***Defendant Kenneth Hoberman*** ("Hoberman") has served on the TG Board since December 2014 and is a member of its Audit Committee and Compensation Committee.

13.      ***Defendant Daniel Hume*** ("Hume) has served on the TG Board since June 2015

and is a member of its Compensation Committee.

14.     Defendants Weiss, Charney, Kennedy, Schoenebaum, Echelard, Hoberman, and Hume are referred to herein as the "Director Defendants".

## TG'S CORPORATE GOVERNANCE

15.     As members of TG's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

16.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of TG, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF DEFENDANTS

17.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of TG, the Director Defendants owed TG and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage TG in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of TG and its investors.

18.     Each director of the Company owes to TG and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial

4

condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

19. To discharge their duties, the officers and directors of TG were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of TG were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how TG conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

20.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of TG, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

21.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, TG has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## SUBSTANTIVE ALLEGATIONS

### Background

22.     TG is a developmental biopharmaceutical company focused on the acquisition, development and commercialization of novel treatments for B-cell malignancies and autoimmune diseases.

23.     TG is currently developing two therapies targeting hematologic malignancies:

- TG-1101 (ublituximab) -- a glycoengineered monoclonal antibody that targets a unique epitope on the CD20 antigen found on mature B-lymphocytes.

- TGR-1202 (umbralisib) -- an orally available PI3K delta inhibitor.

24.    This derivative action concerns TG's UNITY-CLL study, a randomized controlled Phase 3 trial under Special Protocol Assessment ("SPA") evaluating TG-1101 in combination with TGR-1202 for patients with front line and previously treated Chronic Lymphocytic Leukemia ("CLL").

25.    In September 2015, TG reached an agreement with the United States Food and Drug Administration ("FDA") regarding a SPA on the design, endpoints and statistical analysis approach of a Phase 3 clinical trial for the proprietary combination of TG-1101 plus TGR-1202, for the treatment of CLL. The relating to this SPA provides that the Phase 3 trial design adequately addresses objectives that, if met, would support the regulatory submission for drug approval of both TG-1101 and TGR-1202 in combination.

26.    According to TG, the UNITY-CLL trial had two key objectives:

- First -- to demonstrate contribution of each agent in the TG-1101 + TGR-1202 regimen (the combination sometimes referred to as "U2"), and

- Second -- to demonstrate superiority in Progression Free Survival ("PFS") over the standard of care to support the submission for full approval of the combination.

27.    According to TG, the UNITY-CLL trial would randomize patients into four treatment arms:

- TG 1101 + TGR-1202,

- TG-1101 alone,

- TGR-1202 alone, and

- An active control arm of obinutuzumab (GAZYVA®) + chlorambucil.

28.    Then, an early interim analysis would be conducted to assess the contribution of each single agent in the TG-1101 + TGR-1202 combination regimen, which, if successful, will allow early termination of both single agent arms.  According to TG, a second interim analysis will be conducted following full enrollment into the study, which, if positive, the Company planned to use for accelerated approval.

29.    In May 2017, TG announced that the independent Data Safety Monitoring Board ("DSMB") of the UNITY-CLL Phase 3 trial had successfully completed a pre-specified interim analysis to assess the contribution of TG-1101 and TGR-1202 in the combination regimen of TG-1101 + TGR-1202.  According to the Company, the DSMB reviewed efficacy data from approximately 50 patients per arm in the UNITY-CLL study who were eligible for at least one response evaluation.  Based on the overall response rate data available, and in accordance with the statistical analysis plan in the study's SPA, the DSMB determined that contribution has been established and recommended that TG cease enrollment into the single agent arms.

30.    In May 2017 and according to TG, the study began enrolling in a 1:1 ratio to only the two combination arms: the investigational arm of TG-1101 + TGR-1202 and the control arm of obinutuzumab + chlorambucil. Additionally, according to TG, the DSMB reviewed safety data from all patients on study as of the data cut-off date and identified no safety concerns in any treatment group and recommended the continuation of the study without modification.

31.    In September 2017, TG announced that target enrollment in the UNITY-CLL trial was met and that it was extending enrollment until October 12, 2017 for any additional identified study patients to be allowed in the trial.  TG also announced that it expected to report top-line

overall response rate ("ORR") data from this study to be reported in 2018.

**FALSE AND MISLEADING**
**STATEMENTS MADE DURING THE RELEVANT PERIOD**

32.     On June 3, 2018, the Company presented at the annual meeting of the American

Society of Clinical Oncology ("ASCO").  During the presentation, Defendant Weiss was asked

about the unblinding procedure for the data generated by the UNITY-CLL study.  The following

exchange took place:

> **[Reni John Benjamin ("Benjamin") - Raymond James & Associates, Inc.,
> Research Division Senior Biotechnology Analyst:]** And you'll love it because it's
> a UNITY-CLL question.
>
> **[Weiss:]** Don't ask me how the patients are doing.
>
> **[Benjamin:]** No. So can you talk a little about the unblinding procedure, the process,
> right, when you decide to – it's open to the public. What happens, who knows the
> data, what is it that you know at the end of [Audio Gap] the 2 options that you. . . .
>
> **[Weiss:]** Yes. So as everyone, I think, knows, at least in this room, so it's a – it's
> got 2 parts of this trial: we have overall response and then there's progression-free
> survival. So we do have to be cautious about the unblinding process. It's not the end
> of the trial. It's the end of the portion of the trial. So the way it will work basically
> is there's an independent statistician that basically gets the data. So we don't see
> anything.  They do their work and then they, basically read with the Data and Safety
> Monitoring Committee. If it's positive, then we'll have access to the data. If it's not
> positive, we don't get access to anything and the study goes on. What they release
> to us, I think there's definitely going to be caution on how much data does get
> released. I mean, clearly, we'll need enough data to be able to file. So we'll get that
> much data – which, I guess, is a lot at some point. But I think depending on the
> timing of when that's available to us is not fully vetted yet.

33.     On August 7, 2018, the Company issued a press release announcing its second

quarter financial results for the second quarter ended June 30, 2018 and providing a "[b]usiness

[u]pdate."   Defendant Weiss commented on the results and the business update, stating in

pertinent part as follows:

> "We believe TG has never been better positioned for success and look forward to
> an impactful remainder of the year, and importantly the announcement of topline

9

overall response rate data from UNITY-CLL Phase 3 trial before the end of the summer."

34.     That same day, the Company held a conference call with analysts and investors to discuss the Company's earnings release and its business outlook.  During the conference call, Defendant Weiss spoke positively about the UNITY-CLL study stating in pertinent part as follows:

> First and foremost, let's talk about the UNITY-CLL Phase III program. For those of you joining us for the first time, this is a Phase III trial comparing our U2 combination to an active control arm of obinutuzumab plus chlorambucil in patients with both treatment naïve as well as relapse or refractory chronic lymphocytic leukemia. The trial is being conducted under Special Protocol Assessment with the FDA and is a large global trial, including over 600 patients. Enrollment into this trial exceeded our expectations and was completed ahead of schedule in October of 2017 and included approximately 60% frontline patients and 40% relapsed/refractory patients.

> As previously guided, we are targeting top line overall response rate data from this trial by the end of the summer. To remind everyone, we are targeting a 15% absolute improvement in overall response rate. It is also worth reminding everyone that the primary endpoint to this study is progression-free survival, which is expected to support full approval of the U2 combination and ideally support a very broad label for the treatment of CLL.

35.     During the conference call, an analyst asked Defendant Weiss about the release of the UNITY CLL data.  The following exchange took place:

> **[Yatin Suneja ("Suneja"), Director and Senior Research Analyst, SunTrust Robinson Humphrey, Inc., Research:]** Just a question on the time line. So UNITY-CLL data by the end of summer, could you, Mike, maybe tell us where we'll be in terms of the median or mean follow-up when you announced these data? What needs to happen between now and data release?  And have you locked the database yet?  And then I do have a follow-up after that.

> **[Weiss:]** So – thanks for the question, Yatin, of course. So in terms of the median or mean follow-up when we open up, so I think I can give you the minimum follow-up.  I don't think I can give you the median or mean follow-up.  So I'm sure at this point, it's probably obvious to folks that we have decided to wait for the 12 cycles. So we'll have at least, basically, I guess, a minimum of 11 months because it's 48 weeks.  It's 12 cycles of minimum of 48 weeks of follow up on all patients. The median is probably plus another 6 or 7 months, I don't know for sure, but

approximately that probably get us to the median or the mean. What needs to happen now – between now and the release. I guess, in your next part of the question, have we locked the database yet. No, from, I think, when the database is locked to the actual data, it should only be a matter of a few days, I think, once that happens. So if the question was a trick question, you tricked me. Good work. So it's probably not in the next day or 2. But I think, yes, we're – the team – we have a big team, working hard, cleaning data, getting everything put together. Statisticians are making all their preparations and making sure we do this thing perfectly. And just – we know that the goal is to get some information out, but we also need to be mindful of the fact that there's the big PFS coming up behind this and we just need to be cautious. So again, the teams are working hard. The statisticians and our statistician consultants and our team of clinical ops folks are cleaning stuff. So I don't know what else you want to hear from me on this point, but everyone is working hard to get it done as quickly as they can.

**[Suneja:]** Okay. This is helpful. Then you mentioned the big PFS. I mean, obviously, there is an important – that is the primary endpoint. So help us understand the timing or when could we expect that endpoint. I mean, obviously, you're going to use ORR as an accelerated approval endpoint. So maybe also talk about the importance of PFS and, obviously, help us regard the timing?

**[Weiss:]** Yes. So the PFS is, again, a little bit more vague in terms of when it will occur. We've said in the past that our best guess today is sort of slap a normal distribution curve over 2019, put maybe a little tail end to the end of '18 and a tail end to '20. But that – as I said before, that's just a rough guess of what could happen. I think our goal is toward the end of the year or maybe as we get into the ASH time frame or even maybe at JPMorgan, we'll have enough information on event rates to create a better profile of when we think that will occur.

36.     The statements referenced above were false and misleading because the Company failed to disclose and misrepresented the following adverse facts which were known to the Director Defendants or recklessly disregarded by them as follows:

(a)     The Company was involved in cleaning the data collected in the UNITY-CLL study and, as a result, was able to gain an understanding as to the efficacy of the combination therapy;

(b)     as a result of that data cleaning, TG knew that the UNITY-CLL study had failed to meet its stated goal – a 15% increase in ORR and that, as a result, the Company would not be able to seek accelerated approval; and

(c)     given that the UNITY-CLL had failed to meet its stated ORR goal it was

highly unlikely that the combination therapy would meet its primary endpoint of increased

PFS – in other words, the drug therapy had failed.

## THE TRUTH EMERGES

37.     From September 4, 2018 to September 24, 2018, the price of TG stock declined

from $12.40 per share to $9.25 per share as investors reacted to TG's failure to release the

UNITY-CLL study data by September 3, 2018.

38.     On September 25, 2018, the Company announced that it would not be releasing

the data from the UNITY-CLL study and that it had failed to meet the ORR stated goal.  The

Company issued a press release announcing that the DSMB met to review ongoing data from the

UNITY-CLL study and advised the Company that the interim analysis of the ORR could not be

conducted at this time because the data was not sufficiently mature to conduct the analysis.

Defendant Weiss commented on the announcement stating in pertinent part as follows:

> "While we are disappointed that we were not able to report positive ORR today, we
> feel that making the decision to focus on PFS, the primary endpoint for the study,
> is an important step to getting everyone aligned on the endpoint of this study that
> matters most to the Company . . . ."

39.     That same day, the Company held a conference call with analysts and investors to

discuss the announcement about the UNITY-CLL study where Defendant Weiss stated:

> As I'm sure you're aware, we announced earlier today that the Independent Data
> Safety Monitoring Board responsible for monitoring the UNITY-CLL study and
> conducting the interim Overall Response Rate analysis, notified the company that
> the interim analysis of overall response could not be conducted as they felt the data
> were not sufficiently mature.  The DSMB did not provide us further color on the
> maturity but they do plan to meet quarterly going forward to review the ongoing
> progress of the study. For us, the decision by the DSMB to delay the analysis was
> quite disappointing, as we had already waited what we thought would have been a
> sufficient amount of follow-up time.
>
> In light of their decision, we had to really think hard and realistically about the

future potential for an accelerated approval filing based on UNITY-CLL. Faced with uncertain timing as to when the data might mature and uncertain outcome in already challenging regulatory environment for accelerated approval in CLL, it seemed hard for us to continue to guide that we reasonably believed accelerated approval was a credible option. It seems it is the right time to focus on the study's primary endpoint of Progression Free Survival to support full approval of the U2 combination. We just felt that whether overall response is openly positive or not, the delays in getting to mature enough overall response data continue to narrow the gap between potential overall response filing and a PFS filing and thus, again, continued reliance on that endpoint for a rapid path to approval seem misguided.

We feel that making the decision to put this behind us and focus on PFS, the primary endpoint for the study, is an important step to getting everyone aligned with the trial endpoint that matters most to the company and provides the most value to its long-term shareholders. We have always viewed overall response as a free upside option and possibly an early path to accelerate approval and have never viewed any negative or ambiguous overall response results to adversely affect our high-level of conviction in a successful PFS outcome. We have seen how other B-cell receptor antagonists have shown dramatic improvements in PFS in similarly designed studies, and we believe the umbralisib early clinical data supports our belief in a positive PFS outcome for U2. We're anxiously looking forward for the day we can present our PFS curves. As a reminder, the PFS readout is event-driven, and we believe we could potentially reach target events in 2019.

40.     During the conference call, Defendant Weiss confirmed that TG employees were involved in cleaning the study data.  The following exchange took place:

**[Reni John Benjamin ("Benjamin") - Raymond James & Associates, Inc., Research Division Senior Biotechnology Analyst:]** Can you talk a little bit about when the DSMB got this data? And I would've thought that maybe the database and the data was cleaned up and during that cleanup process, it would have become apparent that the data wasn't matured. So I'm just trying to understand, was that done by TG, a third party? And I guess, related to the DSMB, was there a futility analysis that was conducted by the DSMB since they couldn't conduct this ORR analysis?

**[Weiss:]** Yes. So first part of your question, DSMB, they were – basically had the information over the weekend. So we didn't have a lot of time from their position to us to today. You had a few parts to that question, say. . . .

**[Benjamin:]** Yes, I apologize. The database cleanup and – is that done by – or the cleanup of the data, is that done by TG or a third party? And then also was a futility analysis conducted by the DSMB?

**[Weiss:]** Yes, yes. So the cleanup is done by both TG employees and by external

vendors. So it's a collaborative effort to make sure that data is complete. And in terms of a futility analysis, the DSMB did not conduct a formal futility analysis at this meeting. They have access to all the PFS information. They have access to unblinded. They have, obviously, all the safety information. And they are empowered at any – at any point, if they feel that the benefit risk ratio is not appropriate to end the study even outside of a formal futility analysis. So again yes, we can only speculate that they didn't see anything in the safety database and the PFS profile that gave them pause that this study should be stopped for any benefit-risk issue.

41.     In response to the news that the UNITY-CLL study had failed to meet its ORR goal and that potential commercialization would be greatly delayed, the price of TG stock declined from $9.25 per share to $5.15 per share on extremely heavy trading volume.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

42.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Director Defendants.

43.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

44.     Plaintiff is a current owner of TG stock and has continuously been owners of TG stock during all times relevant to the Director Defendants' illegal and wrongful course of conduct alleged herein.  Plaintiff understands its obligation to hold stock throughout the duration of this action and is prepared to do so.

45.     During the wrongful course of conduct at the Company, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

46.     The TG Board is currently comprised of seven (7) members – Defendants Weiss, Charney, Kennedy, Schoenebaum, Echelard, Hoberman, and Hume.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, four (4), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

47.     The Director Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects.  Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Director Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

48.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

49.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

50.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

51.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

52.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, the Director Defendants are unable to comply with their fiduciary duties and prosecute this action.  Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

53.     Additionally, and on information and belief, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

**Defendant Weiss**

54.     Defendant Weiss is not disinterested or independent, and therefore, is incapable of considering demand because he (as its Executive Chairman, President and CEO) is an employee of the Company who derives substantially all his income from his employment with TG, making him not independent.  As such, Defendant Weiss cannot independently consider any demand to sue himself for breaching his fiduciary duties to TG, because that would expose him to liability and threaten his livelihood.  Additionally, Weiss is a named defendant in a securities class action relating to these same events and faces a substantial likelihood of liability.

55.    Defendant Weiss is also a defendant in the securities class action entitled *Reinmann v. TG Therapeutics, Inc., et al.*, Case 1:18-cv-09104 (S.D.N.Y.) (the "Securities Class Action").

56.    Further, TG acknowledged that Defendant Weiss is not independent in its Form DEF 14A filed with the SEC on April 30, 2018.

**Defendants Charney, Kennedy, and Hoberman**

57.    During the Relevant Period Director Defendants Charney, Kennedy, and Hoberman served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

58.    Defendants Charney, Kennedy, and Hoberman breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated by the Company as alleged herein, and otherwise failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. Therefore, Defendants Charney, Kennedy, and Hoberman face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Charney, Kennedy, Schoenebaum, Echelard, Hoberman, and Hume**

59.    During the Relevant Period, Director Defendants Charney, Kennedy, Schoenebaum, Echelard, Hoberman, and Hume served as members of the Compensation Committee.  Pursuant to the Company's Compensation Committee Charter, the members of the Compensation Committee are responsible for, *inter alia*, evaluating the performance of TG's

CEO (Defendant Weiss), and which shall ". . . encourage superior performance, accountability and adherence to the Company's values and code of ethical conduct . . . ."

60.     As stated in its Form DEF 14A filed with the SEC on April 30, 2018:

The Board does not have a formal policy regarding the separation of the roles of Chief Executive Officer and Executive Chairman, as the Board believes that it is in the best interests of the Company to make that determination based on the direction of the Company and the current membership of the Board.  The Board has determined that having a director who is an executive officer serve as the Chairman is in the best interest of the Company's stockholders at this time.

TG has a risk management program overseen by Michael S. Weiss, our Executive Chairman, Chief Executive Officer and President and the Board. Mr. Weiss and management identify material risks and prioritize them for our Board. Our Board regularly reviews information regarding our credit, liquidity, operations, and compliance as well as the risks associated with each.

61.     Director Defendants Charney, Kennedy, Schoenebaum, Echelard, Hoberman, and Hume beached their fiduciary duties by permitting an environment at TG which supported the "fox guarding the henhouse".

62.     Based upon the foregoing and other facts contained herein, Director Defendants Charney, Kennedy, Schoenebaum, Echelard, Hoberman, and Hume face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## FIRST CAUSE OF ACTION

### Against the Director Defendants for Breach of Fiduciary Duties

63.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

64.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

65.     The Director Defendants violated and breached their fiduciary duties of care,

loyalty, reasonable inquiry, and good faith.

66.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  In breach of their fiduciary duties owed to TG, the Director Defendants caused and facilitated the alleged false statements relating to the UNITY-CLL study, and failed to properly oversee TG's business, rendering them personally liable to the Company for breaching their fiduciary duties.

67.     The Director Defendants had actual or constructive knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

68.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

69.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Against the Director Defendants for Waste of Corporate Assets

70.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein

71.     The wrongful conduct alleged regarding the issuance of false and misleading

statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

72.     As a result of the misconduct described above, the Director Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

73.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

74.     Plaintiff, on behalf of TG, has no adequate remedy at law.

### THIRD CAUSE OF ACTION

**Against Defendants for Violations of Section 10(b)
of the Exchange Act and SEC Rule 10b-5**

75.     Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

76.     During the relevant period, Defendants disseminated or approved public statements that failed to disclose that (a) the Company was involved in cleaning data collected from its UNITY-CLL study and was therefore able to gain an understanding of the efficacy of the combination therapy; (b) due to the data cleaning, the Company knew the UNITY-CLL study had failed to meet its stated goal and therefore knew it would be unable to seek accelerated approval; (c) as a result of the foregoing, it was highly unlikely that the combination therapy would meet its primary endpoint of increased progression free survival.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants.

77.     As explained above, the Company issues Defendants stock and stock options.

78.     As such, Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

        (a)     employed devices, schemes, and artifices to defraud; and

        (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

79.     As a result of Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: December 18, 2018

**GAINEY McKENNA & EGLESTON**

By: */s/ Gregory M. Egleston*
    Gregory M. Egleston
Thomas J. McKenna
440 Park Avenue South
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0380
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

*Attorneys for Plaintiff*

## VERIFICATION

I, THESSALUS CAPITAL, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of TG Therapeutics, Inc. and authorize its filing.  I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.  I further declare that I am a current holder, and have been a holder, of TG Therapeutics, Inc. common stock at all relevant times.

_____

KENNETH NG (Managing Director)